IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 5, 2013

**IN RE JEREMIAH I.R.**

**Appeal from the Juvenile Court for Knox County**
**No. 124672      Tim Irwin, Judge**

**No. E2013-00899-COA-R3-PT-FILED-SEPTEMBER 30, 2013**

Spenser R.S. ("Father") appeals the termination of his parental rights to his minor son, Jeremiah I.R. ("the Child"). The Department of Children's Services ("DCS") removed the Child from his mother's custody after a babysitter took the Child and two siblings to the emergency room for injuries to the siblings.[1] Father's whereabouts were then unknown and his paternity of the Child had not yet been established. The Child's mother entered into an agreed order with DCS stipulating that the Child was dependent and neglected in her care. Thereafter, the mother voluntarily relinquished her parental rights.[2] Some 18 months later, DCS filed a petition to terminate Father's rights. The trial court granted the petition based on its findings, by clear and convincing evidence, that multiple grounds for termination exist and that termination is in the best interest of the Child. Father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Spenser R.S.

---

[1]Father is not the biological parent of the other two children, who are the Child's half-brothers. The two are not a subject of the termination order in the present case.

[2]The record indicates that Jamie R. ("Mother"), the Child's mother, voluntarily relinquished her rights to the Child before DCS initiated termination proceedings. She is not a party to this appeal. We refer to her only as necessary to present the facts relevant to Father's case.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

DCS filed its petition to terminate Father's rights on October 5, 2012. At the time of the March 2013 bench trial that followed, the Child was two. He had been in foster care, in the home of T.L.R., his former babysitter (hereinafter "Foster Mother"), and her family since he was four months old. Father was incarcerated at the time of trial and chose to participate by telephone. Father explained that he preferred not to be transported to the courthouse because he would miss his G.E.D. classes. We summarize the proof.

Father and Mother met in high school. Three years later, when Father had just been released from jail, they met again at a grocery store. They slept together that same day. In April 2010, Father learned that Mother was pregnant. That Fall, Father began living with Mother at her grandmother's house. Father testified that Mother used drugs while she was pregnant "on and off" during their relationship. He broke up with Mother before the Child was born after warning her that he would leave if she kept using drugs. Father conceded that, before he left, he did not provide Mother any support or give her any money for the Child. He testified, "I knew she would spend it on drugs."

Foster Mother testified that her goddaughter introduced her to Mother while Mother was pregnant. Foster Mother, herself a mother of three, said she "just stepped in to kind of help her and . . . [the Child]." Foster Mother took Mother to her doctor appointments, bought her food, and purchased all the items she would need for a newborn. The day before the Child was born, Foster Mother took Mother to the hospital, but Mother was not then admitted. Mother telephoned Father, and he came to the hospital. According to Foster Mother, Father was "very intoxicated" when he arrived with two other women, one of whom was also intoxicated. Father and Mother argued for the next three hours. Foster Mother took Mother home after a nurse declined to let Mother leave with Father. The next morning, Mother went into labor. She returned to the hospital where she was met by Foster Mother. The Child was born drug exposed. Father arrived after the Child's delivery. According to Foster Mother, he was "excited and bubbly, saying that . . . he had a new baby." Foster Mother noted that Father still smelled of alcohol. Father stayed with Mother in her hospital room during part of her four-day stay. Foster Mother and her husband provided supplies and furnishings for the Child. Almost immediately, from the time Mother took the Child home, she began calling Foster Mother to babysit.

-2-

Father saw the Child twice before he was jailed – for a second time – for failing to pay child support for another child, a six-year-old daughter. He was incarcerated from February 2011 to May 2011. Father testified he did not check on the Child after he was released because he did not know where the Child was living. Father conceded that, although he was at the hospital, he did not ensure that he was named as the Child's father on the birth certificate. He made no other effort to establish himself as the Child's father. He further admitted he did nothing to make sure the Child was safe after he left the hospital.

On May 18, 2011, DCS took the Child into protective custody following a hospital visit and allegations of physical abuse. Foster Mother, who had been babysitting the Child and his siblings, took all three children to the emergency room after observing severe bruising and other injuries to the siblings. DCS's investigation indicated that the children had been physically abused by a boyfriend of Mother's, and that Mother had failed to protect them. At the time of the Child's removal, Mother was arrested on drug-related charges. Mother and Foster Mother identified Father as the Child's biological father, but they were unaware of his whereabouts and had no contact information. DCS was unable to locate Father until he was incarcerated in August 2011. Once Father was located in prison, DCS secured DNA testing that confirmed Father's paternity. Thereafter, DCS obtained an order requiring Father to pay child support.

In August 2011, Father was incarcerated on a charge of felony theft over $10,000 in connection with his fraudulent use of a stolen credit card. He was convicted as charged pursuant to his guilty plea. In October 2011, he was sentenced to six years in prison. At trial, Father testified he used the credit card to buy "clothes, shoes, a little bit of everything" for himself. He did not buy anything for the Child.

Foster Mother, as someone who knew the Child before he came into foster care, agreed to become the Child's "kinship" foster parent. As a result of the Child's exposure to drugs, he required occupational therapy during his infancy. In addition, he wore a helmet to reshape his head that was flat on one side. Foster Mother testified that, since coming into her care, the Child had undergone "a lot of therapy, in-home and outside of the home, and he ha[d] overcome his issues with the help of the doctors and us being persistent." After six months, the Child was no longer required to wear his corrective helmet. Foster Mother was "absolutely" ready to adopt the Child if given the opportunity. The Child's DCS case manager testified that the Child was doing "very, very well" in the custody of his foster family.

Father was eligible for parole in August 2013. In prison, he took classes five days a week in an effort to obtain his G.E.D. He also completed required anger management

classes. Asked why his parental rights should not be terminated, Father testified that he loved the Child. He continued: "I know I ain't been there for him, but I've been incarcerated." Father said he wanted to "make it right" after he was released. He intended to find a house and a job and become a positive influence in the Child's life.

The trial court terminated Father's parental rights based on its finding of abandonment by failure to support Mother in the months before the Child's birth; abandonment by conduct exhibiting a wanton disregard for the Child's welfare; and a persistence of the conditions that led to the Child's removal. Also, by clear and convincing evidence, the court found it is in the Child's best interest to permanently sever Father's parental rights. Father filed a timely notice of appeal.

II.

Father presents issues for our review that we restate as follows:

> 1. Did the trial court err in finding, by clear and convincing evidence, that Father abandoned the Child by wilfully failing to support the Child's mother in the four consecutive months immediately preceding the birth of the Child?
>
> 2. Did the trial court err in finding, by clear and convincing evidence, that Father, prior to his incarceration, abandoned the Child by engaging in conduct which exhibited a wanton disregard for the Child's welfare?
>
> 3. Did the trial court err in terminating Father's rights based on its finding, by clear and convincing evidence, that conditions persisted that would subject the Child to further abuse or neglect?
>
> 4. Did the trial court err in finding, by clear and convincing evidence, that termination of Father's parental rights is in the best interest of the Child?

On appeal, DCS states that it will not defend the trial court's finding of "persistence of conditions." It takes this position because the Child was not removed from Father's home, Father's whereabouts were unknown at the time of the Child's removal, and Father did not participate in the dependency and neglect hearing or hold himself out as a placement option. DCS moves this court to affirm the trial court's judgment based on its finding of other

grounds warranting termination.  In view of DCS's position, we will only review the issues Father raises as to the remaining grounds as well as the best interest determination.

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great  weight is accorded the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). "This is true because the trial court alone has the opportunity to observe the appearance and the demeanor of the witnesses." *Tenn-Tex Properties v. Brownell Electro*., 778 S.W.2d 423, 426 (Tenn. 1989). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and also the government, they are not absolute, and they may be terminated upon a showing of an appropriate statutory ground. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship  rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful that only a single ground must be clearly and convincingly proven to justify a basis for termination. *In re Audrey S.*, 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

The trial court found that Father abandoned the Child pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iii). The statute provides that "abandonment" occurs when "[a] biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child. . . ." The court found as follows:

> [Father] could have supported the mother during her pregnancy and in the first few weeks since this child's birth when [he] was not incarcerated. He testified that he did not give her any money because he knew she would spend it on drugs. While the Court agrees that it would have been inadvisable to give the mother cash, he could have supported her by ensuring that her expenses for food and housing, medical care, transportation, and supplies and furnishings for the baby were covered. He failed to do that. And the Court, therefore, finds that [Father] abandoned this child in that he willfully failed to support the child's mother during the four months immediately preceding the birth of the child.

The testimony showed that Father was aware that Mother was using drugs when she was pregnant. Before the Child was born, he admittedly refused to give her any money because, in his words, she was continuing to use drugs. At trial, the court was somewhat sympathetic to Father's argument to the effect that "it would have been ill-advised to give a drug-using mother money to support her habit during her pregnancy." We think, however, that the trial court correctly concluded that Father could have found other ways – aside from handing Mother cash – to support her financially in the months leading to the Child's birth. To this end, it does not escape notice that Foster Mother did just that. She provided Mother with meals, transportation to medical appointments, and baby supplies in preparation for the Child's arrival. In contrast, Father did nothing. He essentially left Mother in her pregnant condition and never looked back.

The evidence preponderates overwhelmingly in favor of the trial court's finding that Father willfully failed to support Mother during the four months immediately preceding the Child's birth. The trial court did not err in terminating Father's rights on the ground of

abandonment pursuant to Tenn. Code Ann. § 36-1-113(g)(1)(2010), as defined in Tenn. Code Ann. § 36-1-102(1)(A)(iii)(2010).

V.

Next, the trial court found that Father abandoned the Child as defined in Tenn. Code Ann. § 36-1-102(1)(A)(iv). As relevant in the present case, "abandonment" under subsection (iv) means that "[a] parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . ." The trial court succinctly stated its finding:

> [Father's] conduct prior to incarceration [] exhibits a wanton disregard for the welfare of the [C]hild. He left the [C]hild's mother while she was pregnant, knowing she was using drugs, and took no action to protect the [C]hild. After the [C]hild's birth, he did nothing to establish paternity or to become an active part of the [C]hild's life. He made no effort to locate or check on his child or ensure the [C]hild's welfare and safety. He did nothing. He was in jail and then out of jail and then in jail again. He committed crimes likely to lead to extended incarceration. And he didn't even use any of the proceeds from those crimes for the benefit of the [C]hild. He did nothing to demonstrate that he cared at all.

The court accurately summarized and properly considered the evidence demonstrating Father's wanton disregard for the Child's welfare. As the trial court observed, Father was incarcerated within weeks after the Child's birth – for failure to support another child. A few months later, he went on a $10,000 shopping spree with a stolen credit card and purchased "a little bit of everything" he wanted for himself. Even when the money he had wasn't his own, Father chose not to spend any of it on the Child. Moreover, his conduct landed him back in jail, this time for a six-year term. In all, by the time of trial, Father had been incarcerated for one crime or another for all but four months of the Child's life. Father expressly admitted that, as a result of his actions, he had never "been there" for the Child.

This Court has held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and failure to provide adequate support or supervision for a child can, alone, or in combination, constitute conduct that exhibits a wanton disregard for the

welfare of a child." *In re Audrey S*., 182 S.W.3d at 867-68. All of these factors are present in the instant case. Accordingly, we conclude that the trial court properly terminated Father's rights based on his conduct evidencing a wanton disregard for the Child's welfare.

VI.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. *Id*. Having concluded that the trial court properly terminated Father's rights, we next consider whether the decision is in the Child's best interest. We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(i).[3]

---

[3]The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render

(continued...)

The trial court set out its "best interest" analysis as follows:

> [Father] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [C]hild's best interest to be in his home. [Father] did not maintain regular visitation or other contact with the [C]hild while he had the opportunity to do so and, now, due to his incarceration, is unable to maintain regular visitation. . . . As a result, no relationship at all has otherwise been established between [Father] and [the Child]. A change of caretakers and physical environment from the only home the [C]hild had really known is likely to have a detrimental effect on the [C]hild's emotional, psychological and medical condition. [Father] has shown neglect toward this child. He is incarcerated, without a healthy and safe physical environment to offer the [C]hild.. And he failed to pay child support . . .

The evidence shows that the Child was doing well in his foster home. He was being loved and cared for by Foster Mother, who began taking care of him as a newborn and was the only real "parent" the Child had ever known. Foster Mother expressed her and her husband's certain intention to adopt the Child if the opportunity arose. For his part, Father remained incarcerated for a crime he committed soon after the Child was born. He had an expectation, but no guarantee, that he would be paroled and available to take custody of the Child within the next six months. Asked what assurances he could offer to indicate that he was capable of caring for the Child, Father responded that he planned to find a job and get a house. Father testified, "I really can't tell you offhand cause I really don't know." In our view, Father's efforts to obtain his G.E.D. in prison, and his plans to become a productive

---

[3](...continued)

the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

citizen on his release, are commendable. The question of what is best for the Child, however, must be viewed from the perspective of the Child and not that of the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). In short, we agree with the trial court's closing remarks at trial:

> [The court] [is] clearly convinced that this child staying in his current home where he is thriving, where he's loved, where he has a chance at permanency, a home that wants him forever would be in his best interest [rather] than to be returned to this unstable potential parent.

The evidence does not preponderate against the trial court's determination that the Child's interests are best served by terminating Father's rights and allowing the Child a real "chance at permanency" instead of, at best, uncertainty.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Spenser R.S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE